Filed 3/26/25  P. v. Sharma CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NITISH SHARMA,<br><br>    Defendant and Appellant. | A168273<br>(San Francisco City & County<br>Super. Ct. Nos. SCN231870,<br>17014382) |

A jury found Nitish Sharma guilty of one count of raping an intoxicated person and one count of battery.  Both offenses were committed against Ashley J. in her apartment, following an evening of drinking and dancing.  For these crimes, Sharma was sentenced to three years in state prison.

On appeal, Sharma argues the trial court prejudicially erred by excluding certain evidence of Ashley J.'s conduct with another man the night before.  He contends that conduct and her recounting of it to friends the next morning and again to Sharma the next night were highly probative of her motivation and willingness to lie about her conduct with Sharma, her capacity to consent to sexual intercourse with him, and her actual consent to that act.

We disagree.  Because this evidence concerned Ashley J.'s prior sexual conduct and was not particularly probative of the key element in the case—

1

which was Ashley J.'s *capacity* to consent rather than her actual consent—and because it was likely to cause undue consumption of trial time, confuse the jury and be unduly prejudicial, we see no error.

Sharma also argues that his state and federal constitutional rights to a speedy trial were violated and that the trial court erred in denying his December 2022 motion to dismiss the case based on those violations. We disagree with this argument as well. The record indicates the delay he complains of was the result of a combination of his lengthy waiver of his speedy trial right, the COVID-19 pandemic, his own counsel's unavailability to appear at trial, Ashley J.'s unavailability to testify at trial, and other reasons not explained in the record. We are not persuaded that the trial court was negligent in failing to bring the case to trial sooner or that he was so prejudiced by the delay as to require reversal.

Accordingly, we affirm.

## I. BACKGROUND

In October 2017, the San Francisco District Attorney's office filed a complaint charging Sharma with two counts of raping Ashley J. on or about July 22, 2017: rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)[1], count one) and rape of an unconscious person (§ 261, subd. (a)(4)(A), count two).

Sharma waived his right to a speedy preliminary hearing and arraignment and in September 2019, the San Francisco District Attorney's office filed an information charging him with the same two counts. Although he entered a general waiver of his right to a speedy trial, he withdrew the waiver in July 2021. The court continued his case a number of times until it heard pre-trial motions and commenced trial in the first quarter of 2023,

---

[1] Undesignated statutory references are to the Penal Code.

leading to a jury verdict in early May 2023. Sharma moved to dismiss his case twice, and the trial court denied both motions.

## A. *The Trial Evidence*

At trial, the evidence showed to a mathematical certainty that Sharma's DNA was present in sperm taken from vaginal swabs of Ashley J. obtained the day after the incident.[2] Accordingly, the focus of the trial was on whether Ashley J. had the capacity to consent to sexual intercourse with Sharma, and the credibility of the two key witnesses, Ashley J. and Sharma. The two sides vigorously litigated these issues. Ashley J. and Sharma testified to sharply different accounts of what occurred in her apartment after she was barred from a club due to excessive intoxication, resulting in her vomiting outside the club.

### 1. Ashley J.'s Testimony

Ashley J. testified that as of the day of the incident, July 22, 2017, she was 21 years old, five feet three-and-a-half, and weighed 105 pounds. She estimated Sharma was about six feet tall and weighed 220 pounds. At the time, she was in a committed relationship with a woman who was out of town. She had recently run into Sharma and they had agreed to hang out together. According to her, at about 8:52 that evening, at Sharma's invitation, she arrived at his apartment, where Sharma, his brother, and several others were gathered for an evening of partying together.

---

[2] Sergeant Rightmire of the San Francico Police Department obtained a DNA sample from Sharma. A DNA unit supervisor from the San Francisco Police Department Crime Lab testified that Sharma could not be excluded as a contributor to DNA found in sperm on vaginal swabs taken from Ashley J., and that the probability a random person could not be excluded was roughly one in 21 sextillion.

At the apartment, Ashley J. had three drinks of vodka and Red Bull that Sharma prepared.  The group left for a local club at around 10:00 p.m.  By that time, Ashley J. was feeling a "fuzzy feeling, feeling dizzy, feeling tipsy," and "drunk"; she had enough balance to be able to "just walk," though she "wasn't walking straight."  It was hard for her to make "clear decisions" and her ability to focus clearly on anything was impaired.  She was not able to weigh the long-term consequences of her actions.

At the club, Ashley J. drank, but may not have finished, a pineapple vodka that Sharma bought her.  She danced by herself while holding on to a box to maintain her balance, surrounded by the entire group.  She was "usually good on four shots of alcohol and a drink," and had told one of her best friends, T.J., this was the case in a text the day before.[3]  Nonetheless, at the club, at 10:29 p.m., she text messaged T.J., "oh, god, so drunk."

Ashley J. did not hold hands, kiss, make out, or dance with Sharma at the club.  The two of them went outside because he found it hot inside the club.  There, Ashley J. sat on a curb and "puked over and over."  She felt "[t]errible, sick, drunk."  She was "severely intoxicated," more than she had been at Sharma's apartment.  She was not able to make judgments, evaluate circumstances, make moral decisions, evaluate long-term consequences, focus, or process information.

Ashley J. next remembered being in an Uber with Sharma, but did not know at the time how she got in the Uber or where it was headed.  She vomited when she opened the door to the Uber to enter it.  She also vomited outside the Uber's window when she was in the car.

---

[3] We refer to percipient witnesses by their first names or their initials to protect their privacy, and mean no disrespect by doing so.

4

The Uber went to Ashley J.'s apartment. She next recalled feeling "thrown on [her] bed," and of her pants being "ripped off." She also testified that her body "hit the mattress not as softly as you would, like, regularly get in your bed." She had a "slight" memory of a black camisole tank top being put over the top of her head.

Ashley J. laid on her back on the bed with her hands over her head and her eyes shut. She was "unconscious," "blacked out . . . , unaware of what was going on." At some point, around 11:45 p.m., she became aware of a penis inside her, "going in and out of [her] without [her] consent." She felt "unable to move" and could only "just, like, just happen and move through it."

At that point, Ashley J. could barely move her tongue to speak any words because she was severely intoxicated and blacking out. She verbalized something in her head or out loud, she was not sure which; it was, "don't, don't, don't come inside me." She heard Sharma reply, "I won't." By "don't," Ashley J. meant to say, "don't do this," but she could not get those words out. She said not to come inside her because she was hoping she "wouldn't get pregnant from being raped." She could not recall if she paused in what she said. She also acknowledged stating in a September 2017 civil declaration that she said, "don't come inside me."

After her verbalization, Ashley J. then "went back unconscious." She did not recall how long the penis was inside her.

Ashley J. next remembered waking up alone in her bed at around 6:00 a.m. "Things did not feel right," so she touched herself "on the outside" and saw "sperm on [her] hand." She thought she possibly had been raped. At around 6:42 a.m., she sent text messages to a friend, Christine D. (Christine), T.J., and her girlfriend. Upon receiving their advice, she went to a local hospital to be examined and reported the incident to the police.

5

At the time of the incident, Ashley J. was doubting her compatibility with her girlfriend, but she wanted to "stay together and try to make things work." She had no "romantic" or "sexual" feelings towards Sharma, and did not want to sleep with him. She later broke up with her girlfriend after dating her for about another year-and-a-half and had not had contact with her for three years prior to the trial. She later married a man and had a child with him, but they divorced in June 2020. At the time of trial, she had a long-term male partner, with whom she was raising a baby.

### 2. Sharma's Testimony

Sharma testified that he was drunk when the group went from his apartment to the club. At the club, he was with Ashley J. most of the time, danced with her, and bought her a drink, but she only had one or two sips so he drank it. He also had another drink and a couple of shots. He and Ashley J. were both drunk and danced together all night.

At some point, Sharma was dancing with others when he learned Ashley J. was outside throwing up and he went to talk with her. She wanted to go back inside the club, but the club's bouncer said she could not because she had thrown up. She decided to go home, so, Sharma testified, "we called an Uber for her."

When the Uber arrived, Ashley J. asked Sharma to give her a hand walking to the car because her feet were hurting from her high heels. He "kind of like carried" her by putting his hand around her waist. She opened the car door and vomited outside the Uber, which then left without her. She walked back to the curb by herself and sat there with Sharma waiting for a second Uber to arrive. She said she was sorry and that she felt embarrassed. Sharma helped her walk to a second Uber that arrived. He was "pretty drunk" at the time.

Ashley J. got into the Uber and asked Sharma to go with her. He was there "to party," so asked the others to go with her, but they all said no so he accompanied Ashley J. to her apartment. They were both still drunk but Ashley J. was conscious in the car, which stopped once or twice when she thought she would throw up; she spit a couple of times into a paper bag and seemed to feel better when they got to her apartment.

Ashley J. vomited again outside the apartment. She gave Sharma her key so he could open the door and told him not to be loud because it would bother her roommates. She then went into the bathroom. After a while, he went to the bathroom and found her sitting on the side of the bathtub. He said he wanted to go, but she asked him to stay to help her change her clothes.

Sharma gave Ashley J. a hand to her bedroom, where she sat on her bed. At her request, he helped her change and again said he was going to go. But Ashley J. was "wincing, making, like, pain noises," said her stomach hurt and that she wanted to smoke some "weed" to help her relax. She asked him to stay and he was excited, having smoked weed in the past. He did "two or three hits with her" using a bubbler, which was a small kind of a bong. He thought Ashley J. "probably" smoked some, but he did not actually remember her doing so.

While Sharma smoked, Ashley J. talked "about how she feels guilty and she's upset about something she did really bad . . . ." She asked him what he thought of what she did. He was drunk and high, had no opinion, and said, "Look, you're an adult, it's your life, whatever you do you can make your own decisions. That's it." Ashley J. also talked to him about other things, nicely and loud, "like a normal person." He had no trouble understanding her.

They continued to talk, and Ashley J.'s stomach still hurt. After a little while, he said it was time for him to go but she asked him to lie down with her until her stomach ache was gone. He did so but said he would not sleep over.

After lying down, his next memory was "literally waking up" and looking at his phone. His brother was contacting him to find out if he was coming back to the club and Sharma asked him to call an Uber for him.

Sharma conceded at trial that testing indicated his DNA was on swabs of semen taken from Ashley J., but he did not remember having sex with her or Ashley J. performing oral sex on him. Sharma believed his lack of memory could have been because he had a history of blacking out from drinking and later not being able to remember things that had occurred.

When he woke up at Ashley J.'s apartment, Sharma turned a light on and told Ashley J. he was going, and possibly that someone in the group had gotten drunk and needed his help. She asked him to come back because she was feeling scared. He said he would see if he could come back but that he had to go.

Sharma could not remember how he got back to the club. He next remembered being outside it with his brother and a friend, intoxicated. He went inside the club and drank some more, but the club was closing. He went back outside and saw a fight start that he tried to break up. He was drunk, but his adrenaline kicked in. His next memory was of waking up in bed. He did not recall how he got home.[4]

---

[4] Ashley J. and Sharma also gave accounts to the police of what happened that night. We will not summarize them here, although we will

8

A recording of a man identified by a witness as Sharma calling the police about the fight was played for the jury.

### 3.  The Pretext Phone Call Between Ashley J. and Sharma

On the afternoon after the incident, Ashley J., working with the police, had a "pretext" phone conversation with Sharma, a recording of which was played for the jury.

In the call, Ashley J. indicated Sharma had just texted her to ask how she was doing.  She then said, "Okay, so like, last night was crazy.  Like, I don't know.  I drank a lot."  She asked Sharma how he was feeling and he replied, "I'm perfect."

Ashley J. asked if they had done "any drugs or something?"  She continued, " 'Cause I was like really messed up like."  Sharma said, "We don't do drugs, Ashley.  We don't do any drugs."  He added, "I stay away from everything.  I have never done drugs in my life."  And then he said, "The maximum we have ever done was smoking weed."

Ashley J. told Sharma she did not know why she was so messed up, and acknowledged that she "kind of drank a lot."  Sharma said she had four drinks and suggested she downed them too fast or on a full stomach, which would have messed her up.

Ashley J., after saying she felt "super hungover," asked Sharma how she got home.  He said they took an Uber.  When she said she remembered him carrying her, he said, "Yeah, I was—at the club you were not able to walk . . . ."  He acknowledged that she had, as she said, "puked" outside the club, and told Ashley J. she had decided to go home after the club bouncer "saw you that you were so much drunk he literally told you, you know, you

_____

soon refer to portions of those accounts that are relevant to our resolution of this appeal.

9

can't go inside. So I was like let me just take you home." He said he had asked others to take her but "they were having a party." He continued, "So we took the Uber and actually you were not able to walk, so I picked you up and brought you by the car," where she vomited again. That driver left and they took another Uber, with Sharma holding a bag under Ashley J.'s face in case she continued to vomit.

Sharma told Ashley J. that she vomited again when they got to her apartment, after which she gave him her keys, he opened the door, and Ashley J. ran to the bathroom and sat there for about 20 minutes. She wanted to stay there, but, Sharma said, "I picked you up and brought you to the room . . . ." She said she wanted to change her clothes, so he gave her clothes and, Sharma said, "You pulled down your clothes and kind of I help you out a little bit, but that's it." Sharma continued, "And then you said can you lay down with me for a bit. I laid down for—with you for like 10-15 minutes but then I left."

Ashley J. said she did not remember going to the bathroom because she was "blacked out." Sharma asked her if she was sure because she was talking to him and, when he was leaving, asked him to come back because she did not feel "good" or "safe." Sharma said he told her he would see if he could come back, but that the two other women with them became even more drunk than Ashley J. by the time he returned to the club.

Ashley J. then said that when she woke up her pants were across the room and asked, "Like, did we like make out or anything? Or did we have sex or something?" Sharma said, "No, No. We didn't do anything. I'm not that kind of guy, Ashley." He assured her, "Don't worry about it. Nothing happened."

### 4. Other Percipient Witness Testimony

Other members of the group that went to the club also testified.

a. *R.M.'s Testimony*

One of Sharma's roommates, R.M., said Ashley J. was "a bit drunk" at the pre-drinking party at the apartment, but "in her senses." She was a little more intoxicated at the club. R.M saw Sharma and Ashley J. sitting close together at the club, closer than he would expect for people who were just being platonic.

R.M. followed Sharma and Ashley J. when they went outside the club, where he saw Ashley J. was "extremely intoxicated" and "wasn't even able to walk." Sharma and his brother had to help Ashley J. across the street, and she "puked" in the middle of the street and then right across it where an Uber was waiting for her, which then left. She was no longer "in her senses," "extremely high," and could not stand up or talk. Sharma was drunk but "not too drunk and not too sober," "kind of in the middle" and "in his senses."

A second Uber driver arrived and Ashley J. and Sharma left in it. Sharma returned about one or one-and-one-half hours later and did not seem to have any problems with balance; R.M. did not recall him having trouble speaking and Sharma seemed to understand what he was saying.

b. *R.S.'s Testimony*

Sharma's brother, R.S., testified that the people gathered at the apartment on the night of the incident drank together and "were not drunk yet." He and his brother also drank vodka in the Uber that took them to the club, and Sharma continued to drink at the club. Sharma was "tipsy" then, but not "drunk drunk." Ashley J. had two or three shots at the club.

R.S. saw Sharma and Ashley J. dancing close together and holding hands as they danced, and they danced together the whole night. At some point, he learned Ashley J. was outside throwing up and he went outside with others to help her. She drank some water and they went back inside, with Sharma helping Ashley J. to walk, but she started throwing up again.

People in the group decided someone needed to take Ashley J. home, as she could not take care of herself or navigate a ride home. Sharma tried to get R.S. to do it but he refused. Two Ubers were called because the first Uber rejected Ashley J., who had "a bag" of vomit. Ashley J. thanked people who were outside when she left, indicating she "had a good night." R.S. thought she was drunk because she had vomited. Sharma "was drunk but he was not as drunk as Ashley."

Later, R.S. called or texted Sharma—he could not remember which—to see if he should order an Uber for Sharma, as one of the people in the group had an Uber pass that made rides cheaper.

When Sharma returned to the club, he continued to drink, dance, and talk. He was not slurring his words, it was not hard to understand him, and he was not losing his balance, but he was drunk.

c. *R.N.'s Testimony*

Another of Sharma's roommates at the time, R.N., also was part of the group that went to the club. He testified that about 30 to 45 minutes after they arrived there, he glimpsed Sharma with his hand on Ashley J.'s waist and the two kissing. It "seemed like a make-out session" to him.

**5. Other Evidence**

An expert in forensic toxicology and alcohol-induced memory loss testified about blood and urine collected from Ashley J. at 1:35 p.m. on July 23, 2017. There "was no alcohol or other volatiles present in either the blood or urine." Given standard measures of alcohol elimination, that meant that Ashley J.'s blood-alcohol level could have been at a level of from zero to a range of .13 to .19 the previous evening at around 12:30 a.m.

The expert further testified that in general at an alcohol level of .09 to .25, the ability to create and retain memories could be impaired. Motor function could be impaired, balance and speech are typically impaired, and

vomiting is typical at this range. Critical judgment also could be lost. Typically, fragmented memory loss begins at a level of .14 to .15 and total memory loss can occur at a higher level. Drinking a large volume of liquor fast or quickly makes a person more susceptible to a total memory loss. A memory loss does not necessarily mean a person was not conscious at the time. An " 'alcoholic blackout' " is " 'amnesia for the events of any part of the drinking episode without loss of consciousness. . . . It is not to be confused with passing out.' "

A nurse practitioner at San Francisco General Hospital examined Ashley J. on July 23, 2017, and completed a rape kit. As part of the examination, vaginal and cervical swabs were collected. The nurse practitioner found a microtear of Ashley J.'s posterior fourchette, at the edge of her vagina, which was consistent with an allegation of rape 13 hours previously, or "a lot of other things," such as consensual sexual activity, a scratch, or a yeast infection.

## B. *The Verdict, Sentence, and Appeal*

The jury found Sharma guilty of count one, raping an intoxicated person. It found him not guilty of raping an unconscious person, but guilty of the lesser included offense of battery pursuant to section 242.

The trial court sentenced Sharma to three years in state prison on count one and stayed the sentence on count two under section 654.

Sharma filed a timely notice of appeal.

## II. DISCUSSION

### A. *The Court Did Not Err by Excluding Evidence of Ashley J.'s Encounter with An Ex-Boyfriend the Night Before the Incident*

Sharma argues the trial court prejudicially abused its discretion and violated his due process and Sixth Amendment rights by excluding evidence of Ashley J.'s encounter with another man, a former high school boyfriend,

13

the night before her incident with Sharma. As we will discuss, Sharma repeatedly sought to have this evidence admitted before and during trial on a number of different grounds.

## 1. The Relevant Proceedings Below

### a. *The Proffered Evidence of Ashley J.'s Encounter with Her Ex-Boyfriend*

The proffered evidence regarding Ashley J.'s encounter with her ex-boyfriend is as follows.

#### i. Ashley J.'s Account

We detail Ashley J.'s account from interviews she gave to police and the prosecutor at different times, and some of her trial testimony. She said that the day before the incident with Sharma, she was unexpectedly contacted by Steven W. (Steven), a man she had dated several years before in high school in Virginia and who was visiting San Francisco. She had dinner that night with Steven and his mother.

After dinner, Ashley J. and Steven went to her apartment and, when her friend Christine indicated she could not join them as planned, went to some bars. Ashley J. testified at trial that that night she had three shots of liquor, smoked a bowl of marijuana, and had a hit off of a joint, and that she remembered the events of that night the next day.

Ashley J. "absolutely" did not consider her time with Steven to be a date or a potential "hookup." She said, "That . . . was never any intention in my mind. I was very committed and loyal to my relationship with [my girlfriend]."

The two returned to Ashley J.'s apartment. In her text messages to friends that we next describe, she indicated that, while she was waiting to sober up enough to drive Steven W. back to where he was staying, they briefly kissed and cuddled.

ii. Ashley J.'s Text Messages with Friends About Her Encounter with Steven

Early the next morning, Ashley J. exchanged text messages with Christine about her encounter with Steven. In the course of seeking their admission into evidence, Sharma's counsel provided quotes to the court from these text messages, as well as from those that Ashley J. exchanged with her friend T.J. later that day, as follows[5]:

"a. Ashley: 'So I've come to the conclusion that I'm officially an actual slut.'

"b. Christine: 'omg – what did you do.'

"c. Ashley: 'Steven and I kissed and cuddled.' 'But I didn't like it'

"d. Christine: 'WTF' [meaning—'What the fuck'—showing judgment]

"e. Ashley: 'I feel guilty AF' [meaning 'I feel guilty As Fuck'] 'But I don't want to tell [my girlfriend] because it literally meant nothing to me like I was grossed out.'

"f. Christine: 'I think you should still tell her. That's fucked up. And like try to understand why you did it. Why did you do it anyway?' [Christine shows judgment toward Ashley for cheating, and further judgment for Ashley's refusal to come clean about the cheating to her girlfriend.]

"g. Ashley: 'If I tell her we're breaking up lol' [lol=Laugh out loud.]

"h. Christine: 'But if you don't, that's messed up too.' 'Idk [I don't know] if you feel bad and will never let it happen again.' "

_____

[5] We quote from Sharma's trial counsel's papers, keeping in mind that, based on counsel's presentation, these text messages may not have occurred immediately after each other. The lettering of the messages is in counsel's papers, and our quotes include counsel's statements in the parentheticals but not counsel's time stamps.

15

Nine hours later, Ashley J. exchanged texts with T.J.:

"i. Ashley: 'I feel bad for kissing Steven last night but honestly that was kinda disrespectful of him on his part.' [9 hours after conversation with Chirstine.]

"j. [T.J.]: 'Okay tell me'

"k. Ashley: 'He knew I was gay and had a girlfriend like why did he come onto me like that and assume id be okay with it.'

"l. [T.J.]: 'Well was he throwing himself at you? Cuz that's kind of like molest[a]tion [sic] or something.'

"m. Ashley: 'I was laying down and he got on top of me and was like slowing getting to my face and the whole night he was being flirty and I guess to him he thought I was too but like no.' 'I didn't want that to happen like I was just letting him crash at my place until we got sober enough for me to drive him back down to redwood city.'

"n. [T.J.]: 'So you're saying you felt pressured into it?'

"o. Ashley: 'No. I feel bad rejecting people.' 'But yes I suppose that is how I felt.'

"p. [T.J.]: 'Just try to make sure not to let something like that happen again at least while you're dating someone.'

"q. Ashley: 'Yes I won't i learned my lesson'"

### iii. Sharma's Account to Police of What Ashley J. Told Him About Her Encounter with Steven

Sharma agreed to be interviewed by Seargeant Rightmire of the San Franisco Police Department on August 29, 2017, about five weeks after the incident and Ashley J.'s first report of it to police. He sought unsuccessfully to have admitted into evidence his account of what Ashley J. told him about her encounter with Steven the night before the incident, which was as follows:

16

"SGT. RIGHTMIRE: Okay. And that's the complete story?

"NITISH SHARMA: Well, that's it, no, when I came back over there I went back to the – before leaving she said oh are you leaving and I'm like yeah. Will you please come back because I really want to sleep with you, you know, like she was, she actually kind of like told me she likes me and all that, so I was a little bit – because she's uh, gay.

"SGT. RIGHTMIRE: She's gay.

"NITISH SHARMA: She's gay.

"SGT. RIGHTMIRE: Okay.

"NITISH SHARMA: And she was a little bit upset about it too because she said that she cheated on her girlfriend the night before on Friday night.

"SGT. RIGHTMIRE: With?

"NITISH SHARMA: With a guy. I'm like okay.

"SGT. RIGHTMIRE: So – wait a minute – she cheated what?

"NITISH SHARMA: She cheat – she has a girlfriend –

"SGT. RIGHTMIRE: Right.

"NITISH SHARMA: Like even, even when we lived over there in Daly City there was this girl who used to come to see her.

"SGT. RIGHTMIRE: So she has – she, dates women but she told you that night that she, she cheated on her girlfriend with a, a guy?

"NITISH SHARMA: With a guy.

"SGT. RIGHTMIRE: And that was when?

"NITISH SHRMA: The night before, on Friday night.

"SGT. RIGHTMIRE: Friday night.

"NITISH SHARMA: Yep.

"SGT. RIGHTMIRE: She cheated.

"NITISH SHARMA: Yep.

17

"SGT. RIGHTMIRE: With a guy. Okay.

"NITISH SHARMA: That's what she told me. I don't know if she did that or not.

"SGT. RIGHTMIRE: Okay.

"NITISH SHARMA: She's like I can't – because actually she just turned gay.

"SGT. RIGHTMIRE: Okay, Okay."

b. *Sharma's Motions Below*

Sharma repeatedly sought to have evidence of Ashley J.'s encounter with Steven admitted on a variety of grounds. First, he sought admission via a motion in limine of "Ashley J.'s previous sexual conduct" under, among others, Evidence Code sections 780, 782, and 1103. He argued this evidence was relevant to Ashley J.'s credibility and that its probative value was not outweighed by the risk of undue prejudice.

The court denied this motion on the grounds that "the proffered testimony, if it has any probative value, is substantially outweighed by the potential to confuse the issues, confuse the jury, and undue prejudice as to be excludable under 352." The court was not persuaded that the evidence was relevant to Ashley J.'s credibility because whether Ashley J. consented to a sexual act with Sharma was not relevant to the charges, which focused on her capacity to consent instead, and the evidence was "so confusing in the context of a rape trial like this that it's going to be excluded with very few exceptions."

Sharma moved for a hearing under Evidence Code section 782, the rape shield law, concerning Ashley J.'s prior sexual conduct. Sharma's counsel argued the evidence was probative regarding the credibility of both Ashley J. and Sharma because (1) some of the evidence, particularly Ashley J.'s text message exchanges with Christine and T.J. about this prior sexual conduct,

18

showed she had a motive and the capacity to lie about her encounter with Sharma; (2) the evidence bolstered Sharma's credibility because he told the police in 2017 that Ashley J. had disclosed her conduct to him at her apartment; and (3) the evidence was relevant to Ashley J.'s capacity to consent to sex with Sharma because it showed she was "able, she was rational, she was discussing feelings about previous relationships, [and] she had feelings and thoughts about the contours and limitations of her relationship with [her girlfriend]."

The court allowed Sharma to introduce evidence of Ashley J.'s conversations with Sharma in her apartment, but not about his specific contention that she said she cheated with Steven the night before or whether she lied about it in texts with her friends the next day. As we have already discussed, Sharma subsequently testified that Ashley J. told him in her apartment that she felt guilty about something she had done.

The court explained that jurors could find that Ashley J. had a motive to lie about having consensual sex with Sharma because she was in a committed relationship at the time and, therefore, "[y]ou don't need to have evidence that she previously kissed and cuddled with someone else the night before to sort of give a motive to lie." Further, the court found that the proffered evidence did *not* show a lack of credibility, rejecting Sharma's contention that Ashley J.'s text messages with Christine were inconsistent with those she made to T.J. nine hours later. The court concluded that Ashley J. was "expressing ambivalence and thinking something through with her friends," which was "not the same thing as lying."

Next, Sharma filed a supplemental motion to admit the prior sexual conduct evidence under Evidence Code section 782, once more arguing that it went directly to Ashley J.'s credibility for much the same reasons as he

19

previously had asserted and was not inflammatory, given that it did not involve "sex" but only kissing and cuddling. The trial court denied the motion for the reasons it had previously stated.

After Ashley J. testified that her friends would not be critical of her if they knew she had had sex with Sharma, Sharma renewed his motion to have the evidence of her encounter with Steven admitted. His counsel argued circumstances had changed because Ashley J. had lied in her testimony, since her friends "admonished [her] not to hook up again" the day before, "which is why she felt guilty immediately after she hooked up with my client." The court found a difference in phrasing perhaps but no inconsistency between what Ashley J. testified to and her text messages, and denied the motion. The next day, the court also denied Sharma's motion to reconsider its ruling.

Ashley J. then testified that her girlfriend would not have left her if Ashley J. had kissed someone on the dance floor, and that she did not know if her girlfriend would have left her if she went home after a night of partying or had sex with someone else. Sharma then sought admission of Ashley J.'s text message to Christine the morning after her encounter with Steven that, if she told her girlfriend about her encounter with Steven, "we're breaking up lol." The court denied this motion as well.

Finally, Sharma moved to have the evidence admitted as a "remedy" for what he argued was prosecutorial misconduct. Sharma argued below that the prosecutor committed misconduct "when he insinuated, during cross-examination of Mr. Sharma, that Mr. Sharma fabricated the conversation in which Ashley divulged to Mr. Sharma at her apartment that she had done something that she felt guilty about. The district attorney knew, or had reason to know, this conversation was not fabricated, . . . and . . . took

20

advantage of [the] exclusion [of the evidence of her encounter with Steven] to insinuate [Sharma] fabricated the conversation." Sharma requested a curative instruction and the admission of the previously excluded evidence.

At the hearing on Sharma's motion, the court found the prosecutor had not committed misconduct and that no curative instruction was necessary. It also incorporated its "entire analysis of why the . . . specific hearsay statement by Ashley that she cheated on her girlfriend the night before would be highly likely to be taken for its truth and highly likely to cause the jury to make a decision . . . based on something other than the evidence." The court said it would consider admission of some evidence to corroborate Ashley J.'s statement that she felt guilty, however. Sharma's counsel then requested a stipulation that Ashley J. told Sharma she felt guilty about something she had done.

The prosecutor responded by indicating (apparently at first off the record) that he was considering putting into evidence in rebuttal all of Sharma's 2017 statements in his interview with Sergeant Rightmire to show that Sharma never raised smoking marijuana with Ashley J. in her apartment that night, including that Ashley J. told Sharma in a conversation in her apartment that she had cheated on her girlfriend the night before with a man. The prosecutor said he believed the conversation was not "all that nuanced," nor "a complex conversation about emotions" as Sharma contended, that the conversation did not occur in her apartment, and that the evidence had "gotten out at the edges," so it seemed "like it's much better to just get it out." He said that if he decided to introduce the evidence he would also call Ashley J. back to testify about her encounter with Steven, and also put on Steven, Christine, and T.J.; he also wanted to present an expert on the existence of acid phosphatase, found on a swab of Ashley J.'s mouth, in things

21

such as saliva and gastric juices in light of other expert testimony presented that it could be found in semen.

Sharma's counsel objected to the introduction of Sharma's 2017 interview statements in their entirety on rebuttal as too lengthy and cumulative. She also argued the prosecutor should have introduced these statements while cross-examining Sharma rather than introduce it in rebuttal, when Sharma could not respond, characterizing it as an improper extension of the People's case-in-chief. Counsel further contended that Ashley J. testifying about a lack of memory of smoking marijuana was cumulative; said Sharma would not object to Ashley J. testifying about what occurred between Ashley J. and Steven; said Sharma would object to Steven's testimony as violative of section 352 because what was relevant was Ashley J.'s state of mind about what she did with him; and objected to the expert testimony as an extension of the People's case-in-chief. Counsel requested that if the court admitted his 2017 interview statements, Sharma and Rightmire be allowed to testify to it first, in addition to any surrebuttal Sharma would present.

The court, again noting that it did not find prosecutorial misconduct and, therefore, was not ordering the excluded evidence in as a remedy, told the prosecutor it was "a little dismayed that you would invoke this Court's authority to exclude prejudicial evidence until you decide it is not terribly prejudicial any more . . . ." The prosecutor explained his change of position was based on Sharma's very recent reliance on the purported conversation he had in Ashley J.'s apartment for admission of the evidence.

After hearing additional argument, the trial court ruled. It began by stating it was "brand new that Ashley exhibited signs of capacity to consent based on suggesting marijuana and putting together a bubbler and loading it

22

and lighting it." Also, it was "a fair inference from the Defense testimony that Ashley was smoking marijuana, which would tend to show her capacity to make decisions and do complex delicate fine motor tasks like loading a bubbler." The expert testimony was also fair rebuttal, as were most of Sharma's statements to Rightmire.

As to the nature of Ashley J.'s encounter with Steven and her concern about cheating on her girlfriend, however, the court repeated its consistently expressed belief "that that evidence does not belong in this trial. I see it as highly prejudicial to the People's case because, as I said, it demonstrates propensity, and . . . jurors are unfortunately sometimes likely to base decisions that someone acted sexually promiscuous on one occasion because they did so on a prior occasion." Nonetheless, the court noted, "[t]he People are no longer seeking the benefit of that ruling" and neither party was contending that evidence was prejudicial. The court continued:

"However, throughout the trial I have also seen tremendous potential for consumption of trial resources about what is not terribly probative in this case. Whether or not Ashley made out with or kissed [Steven] the night before has nothing to do with whether she had the capacity to consent or was unconscious on this occasion.

"I see a lot of potential for spending a lot of court time on drilling down on exactly what happened the night before, how Ashley felt about it, how she characterized it to her friends, how she characterized it to Mr. Sharma, what she recalls, if anything, about characterizing it to Mr. Sharma.

"In other words, there is a lot of context, I think, . . . that both sides, it appears, would want to put in about this event, and I think that that really illustrates the danger of undue consumption of time.

23

"This is an extrinsic event that—you know, proving whether this event happened or not, and how it happened, and how people felt about it does not prove anything about the allegations at issue in the case against Mr. Sharma.

"The only thing that it is relevant to is the truth of Mr. Sharma's statements about the conversation . . . he had with Ashley that night in the apartment." The court also commented that it was not typical practice to bolster credibility with independent evidence of an event.

Accordingly, the court excluded Sharma's related statements to Rightmire in 2017 under Evidence Code section 352 as unduly consumptive of time for a largely irrelevant event, regardless of which party sought its admission. The court said it would allow the parties to stipulate to the conversation between Sharma and Ashley J. occurring if they wished.

Sharma's counsel asked to recall Sharma to the stand to testify about the 2017 statements to Rightmire that would be played later when Rightmire testified, to which the prosecutor objected. The court denied the defense request, ordering that the trial would proceed in normal order. The court allowed Ashley J. to testify in rebuttal that she did not recall smoking marijuana. She did so, and also testified that she did have a bubbler in her room at the time and that she would not smoke marijuana to soothe her stomach. But the court denied as not probative the prosecutor's request to have Ashley J. testify as to the timing of her conversation with Sharma about the night before, which the prosecution contended probably occurred earlier in the evening, before she even arrived at Sharma's apartment, given the timing of her text messages with T.J.

Subsequently, as we have recounted, Sharma testified that, while he smoked marijuana from a bubbler in her bedroom, Ashley J. talked "about how she feels guilty and she's upset about something she did really bad . . . ."

24

She asked him what he thought of what she did.  She also talked to him about other things, nicely and loud, "like a normal person."  He had no trouble understanding her.

Also, the trial court read to the jury the following stipulation between the parties:  "In the redacted part after the interview between Sergeant Rightmire and Mr. Sharma, Mr. Sharma related to Sergeant Rightmire how sometime that night Ashley said she was upset about something she had previously done, specifically she described in a few phrases what Ashley said she had done and when."

### 2.  Relevant Legal Standards

Sharma focuses his appeal on his conviction for violating section 261, subdivision (a)(3), which, as indicated in the court's CALCIM No. 1002 jury instruction, makes it unlawful to have sexual intercourse with someone if he or she is prevented from resisting sexual intercourse by an intoxicating substance and this condition was known, or reasonably should have been known by the accused.

The court's instruction defines what constitutes intoxication to the point a person is prevented from resisting, providing that, "A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent.  In order to give legal consent, a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.  Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved."  Sharma does not contest the propriety of the court's instructions.

A criminal defendant has a "fundamental constitutional right to a fair opportunity to present a defense."  (*Crane v. Kentucky* (1986) 476 U.S. 683, 687.)  "Whether rooted directly in the Due Process Clause of the Fourteenth

Amendment [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Id.* at p. 690.) " ' "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." ' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678, italics omitted (*Van Arsdall*).) Trial courts, however, "retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Id.* at p. 679.)

As a panel of this division recently explained, "Proper application of *Van Arsdall* requires threshold consideration of whether the trial court exercised sound discretion under state law evidentiary standards in limiting the scope of cross-examination. The high court's acknowledgment that trial courts 'retain wide latitude . . . to impose reasonable limits on such cross-examination' [citation] leaves room for an evaluation of admissibility under the Evidence Code, tested under the deferential abuse of discretion standard of review governing such discretionary questions [citation]. If the trial court excluded 'evidence of marginal impeachment value' [citation] or otherwise merely carried out the routine evidentiary function of controlling the scope of permissible cross-examination, the answer to this initial evidence question will generally be yes—the trial court was within its discretion—and the inquiry comes to an end. There was no error, under either state law or under the Sixth Amendment." (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1282, fn. omitted.)

"Evidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions."

(*People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*); Evid. Code, § 1103, subd. (c).) Its admissibility to attack a complaining witness's credibility is governed by Evidence Code sections 780 and 1103, which together provide narrow exceptions to the general rule of exclusion. (*Fontana,* at pp. 362–363; *People v. Chandler* (1997) 56 Cal.App.4th 703, 707.) Evidence Code section 780 generally identifies factors a jury may consider in determining the credibility of a witness that have a "tendency in reason to prove or disprove the truthfulness" of that witness's testimony.

Evidence Code section 782, subdivision (a) sets forth the procedure for determining the admissibility of such evidence. " '[G]reat care must be taken to insure that this exception to the general rule barring evidence of a complaining witness' prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a "back door" for admitting otherwise inadmissible evidence.' " (*Fontana*, *supra*, 49 Cal.4th at p. 363.) Evidence Code section 782 provides that " 'evidence of sexual conduct' includes those portions of a social media account about the complaining witness, including any text . . . which depict sexual content, sexual history, nudity or partial nudity, intimate sexual activity, communications about sex, sexual fantasies, and other information that appeals to a prurient interest, unless it is related to the alleged offense." (Evid. Code, § 782, subd. (b)(2).)

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Pursuant to Evidence Code section 352, a trial court must "balance the probative value of the offered evidence against its potential of prejudice, undue consumption of time, and confusion. [Citation.] That

27

balancing process requires consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion. [Citation.] The more substantial the probative value of the evidence, the greater the danger of the presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence." (*Kessler v. Gray* (1978) 77 Cal.App.3d 284, 291.)[6]

Evidence of a complaining witness's character trait that is relevant under section 1103 also may be excluded under section 352. (*People v. Stitely* (2005) 35 Cal.4th 514, 547–548 & fn. 15.) Under section 1103, in prosecutions under section 261 such as Sharma's, "evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness." (Evid. Code, § 1103, subd. (c)(1).) However, it "does not make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in [Evidence Code] Section 782." (Evid. Code, § 1103, subd. (c)(5).)

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) A trial court abuses its discretion if no reasonable decision-maker could have made

---

[6] Sharma argues our Supreme Court articulated that there is "a presumption in favor of admission" for exculpatory evidence under Evidence Code section 352 in *People v. Wright* (1985) 39 Cal.3d 576, 584 to 585. We disagree. In the passage cited, the court merely gave what it had previously characterized as " '[wise] advice' " to trial courts to admit such evidence when it is not plainly inadmissible as a matter of best practice.

28

the decision under the circumstances.  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

### 3.  Analysis

Sharma presents numerous arguments for why the trial court prejudicially abused its discretion and violated his due process and Sixth Amendment rights by excluding the evidence of the nature of Ashley J.'s encounter with Steven.  His many contentions include a number of exaggerations and mischaracterizations of the record and the law.  But most importantly, he fails to satisfactorily contend with the nature of the discretionary rulings the court made:  because the charge of rape while intoxicated hinged on the complaining witness's *capacity* to consent rather than *actual* consent, the trial court needed to balance the probative value of any propensity evidence suggesting actual consent against any prejudice, confusion, and consumption of time that would result if the evidence were admitted.

The discretionary balance the court struck was based on extensive consideration of these matters and the particular circumstances of this case. It could reasonably conclude the proffered evidence was of limited, if any, probative value because, as the trial court repeatedly noted, Ashley J.'s actual consent was not relevant to the charges brought; the court could also reasonably conclude the evidence would confuse the jury and possibly prejudice it unduly and lead to an unduly large consumption of time. Therefore, the trial court's rulings were well within its discretion.

As we have discussed, Evidence Code section 782 was an express basis for some of Sharma's motions.  It was a part of the trial court's rulings excluding evidence of Ashley J.'s encounter with Steven (which we shall call the "ex-boyfriend evidence"), which, as we have also discussed, the court

29

incorporated into its last rulings made upon Sharma's prosecutorial misconduct motion.

Sharma argues that we need not determine that the ex-boyfriend evidence was inadmissible as evidence of prior "sexual conduct" under Evidence Code sections 782 and 1103 nor consider our Supreme Court's requirement that a trial court exercise " '[g]reat care' " to ensure allowing in evidence of prior sexual conduct for credibility purposes in rape cases is not a " 'back door' for admitting otherwise inadmissible evidence' " of propensity (*Fontana*, *supra*, 49 Cal.4th at p. 363; see Evid. Code, §§ 780, 782, 1103). He bases this argument on the contention that the ex-boyfriend evidence did not involve any "sexual conduct," contending it showed "romantic conduct" only. He argues the evidence did not appeal to "prurient" interests, a term referred to in Evidence Code section 782, subdivision (b)(2), because it was not, among other things, "marked by arousing, or appealing to sexual desire," which is part of the dictionary definition of "prurient," and because the evidence does not meet the definition of "sexual conduct" in section 311.3, subdivision (c), a provision prohibiting the sexual exploitation of children.[7]

---

[7] Section 311.3, subdivision (c) provides, "As used in this section, 'sexual conduct' means any of the following:

"(1) Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex or between humans and animals.

"(2) Penetration of the vagina or rectum by any object.

"(3) Masturbation for the purpose of sexual stimulation of the viewer.

"(4) Sadomasochistic abuse for the purpose of sexual stimulation of the viewer.

"(5) Exhibition of the genitals or the pubic or rectal area of any person for the purpose of sexual stimulation of the viewer.

We disagree. Section 311.3's definition of "sexual conduct" was limited to that section alone, and its subject matter—the sexual exploitation of children—has nothing to do with the matters before us. Further, Sharma's own designs in using the ex-boyfriend evidence indicate his acknowledgment of its relationship to an appeal to sexual desire. At no time did he treat this evidence as chaste evidence of romance alone; to the contrary, as we have discussed, he argued this evidence was, among other things, probative (1) of his contention that Ashley J. consented to *sexual intercourse* with Sharma the next night and (2) of Ashley J.'s credibility, or lack thereof, contending her friends' text message reactions to her report of the incident gave her a motive to lie about having consensual sexual intercourse with Sharma the next night. Also, Sharma's trial counsel sought to have admitted what counsel characterized as "sexual conduct" evidence under Evidence Code section 782. Indeed, Sharma does not point to any instance below when he contended the evidence did *not* involve sexual conduct—the closest is his contention at one point that the kissing did not involve "sex," but that is a different argument. Also, in his appellate papers, he repeatedly refers to the evidence as involving a "make-out" session between Ashley J. and Steven, thereby indicating it was of a sexual nature as he himself defines it, involving an appeal to sexual desire. Also, the evidence itself includes Ashley J.'s reference to herself as a "slut," and Sharma's recollection that Ashley J. told him she had "cheated" on her girlfriend the night before. All of this makes clear that in the proceedings below the parties and the court did not question that Ashley J.'s encounter with Steven involved sexual conduct.

---

"(6) Defecation or urination for the purpose of sexual stimulation of the viewer."

31

Further, courts have construed "sexual conduct" within the meaning of Evidence Code section 782 broadly. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456; see *People v. Franklin* (1994) 25 Cal.App.4th 328, 334, fn. omitted ["[S]exual conduct . . . encompasses any behavior that reflects the actor's or speaker's willingness to engage in sexual activity. The term should not be narrowly construed."], citing *People v. Casas* (1986) 181 Cal.App.3d 889, 895 [solicitation of an act of prostitution was " 'sexual conduct,' " which was not limited to "only acts of sexual intercourse"].)

We conclude the ex-boyfriend evidence included sexual conduct. The trial court was required to, and did, take great care in determining whether to admit this evidence because of that conduct. As the *Fontana* court cautioned, "For some jurors, the fact that the victim has engaged in sexual conduct outside of marriage automatically suggests a receptivity to the activity or is proof that the victim got what she deserved—neither of which is a rational or permissible inference." (*Fontana*, *supra*, 49 Cal.4th at p. 370.) The court's exercise of its discretion with these considerations in mind was appropriate, and the sexual nature of the evidence supports its determination to exclude it.

But even if we were to consider the court's exercise of its discretionary authority under Evidence Code section 352 alone, we would also conclude the trial court did not abuse its discretion in excluding the ex-boyfriend evidence. As the trial court concluded, the evidence was not particularly probative of whether Sharma raped an intoxicated person, which involves the key element of whether the person lacked the *capacity* to consent rather than whether the person actually consented.

Sharma argues the evidence was highly probative of Ashley J.'s overall credibility, as her friends' purportedly negative text messages to her the next

morning regarding what she had done gave her a motive to lie about her encounter with Sharma in order to avoid their potential judgment and scorn. Sharma further contends that the differences in Ashley J.'s descriptions of what she did with Steven to Christine—to whom she referred to herself as a "slut" and did not state that Steven forced himself on her—and to T.J.—to whom she indicated Steven had gotten on top of her and disrespected her— show Ashley J.'s willingness to "lie," and therefore was probative of her overall credibility, presumably about her consciousness and capacity the next night with Sharma as well as her actual consent.

This is a weak argument. It is premised on exaggerations of those text messages, which we have recounted in detail above. We fail to see that Christine's and T.J.'s texted reactions to Ashley J.'s accounts of what she did with Steven show a level of judgment or scorn from which a reasonable juror could conclude Ashley J. was motivated to accuse an innocent man, Sharma, of rape in order to avoid her friends' additional judgment and scorn. Rather, as the trial court noted, they show Ashley J. expressing ambivalence and talking things out with trusted friends. And Sharma does not point to any evidence indicating that Ashley J. had to tell Christine and T.J. about what she did with Sharma, or that the two would otherwise be able to find out, further crippling this "motive to lie" argument.

Also, we agree with the trial court that Ashley J.'s varying accounts to her two friends did not show that she was willing to lie—the accounts were more similar than not, for example both indicating she did not like her brief kissing with Steven. And in any event, whatever differences in her accounts to the two friends and their responses, they do not demonstrate she would go so far as to make up a rape in order to avoid their judgment or scorn, or that

she feared telling them what had actually occurred with Sharma could end these friendships.

Further, Sharma is too dismissive of what the court *did* allow into evidence. His attack on the court's treatment of this proffered evidence disregards the fact that the court did exactly what the law requires—it *balanced* considerations for and against admission, and struck the balance in a manner Sharma would prefer was more favorable to him. The court allowed Sharma to testify that Ashley J. had a conversation with him at her apartment while he smoked weed that she felt guilty about something she had done, asked his opinion about it, and discussed other subjects with him, and the court also allowed in a stipulation by the parties that Sharma had told Rightmire years before, in 2017, that Ashley J. said she was upset about something she had previously done. This gave the defense evidence from which it could both argue that Ashley J., able to maintain a conversation about a moral quandary, had the capacity to consent with Sharma, and that Sharma was credible in recounting at trial what Ashley J. told him at her apartment that indicated this capacity.

Sharma also fails to persuasively explain why he could not just as effectively argue that Ashley J. had a motive to lie about having sex with Sharma so that her girlfriend would not discover the truth as he could contend that Ashley J. wanted to avoid the additional judgment and scorn of her friends. He himself argues in his reply brief, "Common sense tells us almost anyone would get angry if their romantic partner laid on a bed and made out with someone else – even if they didn't have a 'willingness to engage in sexual activity.' [Citation.] Thus activity short of 'sexual conduct' has the capacity to cause jealousy and end relationships." He also argued below in one of his motions that "Ashley's guilt over cheating on her girlfriend

twice in a row, two nights in a row, gives her motive to recast herself as the victim of sex with Nitish Sharma, rather than an active consenting participant."

We see no reason to disagree with the trial court that admission of the ex-boyfriend evidence had the significant potential of necessitating an undue consumption of time at a trial. The prosecution made clear that, if the evidence was introduced, e.g., Sharma's 2017 account to police that Ashley J. told him in her apartment that she had cheated on her girlfriend, it intended to call additional witnesses on the subject in rebuttal—Ashley J., Christine, and T.J. All indications are that Sharma would have sought time to present a surrebuttal. The trial began on March 27, 2023, and the court's last ruling regarding the ex-boyfriend evidence occurred on April 24, 2023. The reporter's transcript of the trial and arguments that occurred up to that point is over 2,000 pages long, reflecting the extensive examinations, cross-examinations, and related arguments the parties engaged in throughout the trial. Given the very limited, if any, probative value of the ex-boyfriend evidence, the court could reasonably rely on this undue consumption of time to exclude the evidence.

Sharma argues that the trial court's reference at one point in the last hearing that the presentation of the additional evidence would require "maybe a day of trial testimony" shows there would not be an undue consumption of time. The court's comment was in passing, however, during the hearing and hardly meant to be definitive; that the court later asked the prosecutor to estimate the time it would take to present his evidence (the answer to which is not in the record) shows that to be the case. Sharma also notes that the record indicates the jurors had been cleared for hardship through May 9, 2023, over two weeks away when the court made its ruling.

But given the length of the trial (the jury returned its verdict on May 3, 2023), we do not see this as relevant to the court's concern about unduly taking up more of the jury's time.

We also conclude that the court was within its discretion to consider the undue prejudice that would be caused by the admission of the ex-boyfriend evidence, even under section 352 alone, for the reasons we have stated in discussing the great care the court was required to take under Evidence Code sections 782 and 1103, and related case law. Sharma argues the court did not actually rely on a finding of undue prejudice in its last ruling and could not have in light of the prosecution's desire to admit the ex-boyfriend evidence. We disagree based on the court's comments at the last hearing, which we have recounted. Also, the record shows only that the prosecutor was considering introducing the evidence, not that he had made a final determination to do so; in any event, Sharma fails in his burden as appellant to show that the court could not find prejudice even if both parties wanted the evidence admitted. Nonetheless, our affirmance is not based on the court's prejudice finding but on the trial court's other concerns.

Finally, we conclude the court was reasonable in its concern, expressed regarding previous motions by Sharma, that the ex-boyfriend evidence had the potential to confuse the jury regarding the difference between a person's *capacity* to consent and that person's *actual* consent. This potential for confusion is perhaps best seen by Sharma's own presentation in his appellate papers. Although he does not contest that actual consent was an element of the charged offenses, Sharma repeatedly argues the ex-boyfriend evidence should have been admitted because it was probative of Ashley J.'s actual consent, sometimes as part of his "motive to lie" argument but not always. For example, he asserts, "Evidence that Ashley laid in her bed and made out

with [Steven] the previous night proved that Ashley, even though she professed to be gay, would consensually engage in this conduct with a man. A reasonable juror could have inferred from the fact that Ashley consensually engaged in this conduct with [Steven] that it was consensual when she engaged in the same conduct with [Sharma]. Thus the evidence would have had the tendency to disabuse the jurors of a belief that Ashley would not have consensually made out with [Sharma] because she was gay."[8] We think the court could reasonably conclude that a juror could become similarly confused and consider the ex-boyfriend evidence for the wrong reason.

In summary, Sharma's claim that the trial court erred in excluding the ex-boyfriend evidence lacks merit. The court was reasonable in concluding the evidence was of limited probative value, which was outweighed by the undue consumption of time it would take to present it. This was reason enough to exclude the evidence. The court's determination that the potential prejudice and confusion caused by the evidence also outweighed its probative value was similarly reasonable. In light of our conclusion that there was no abuse of discretion in limiting the evidence of Ashley J.'s encounter with Steven, we have no need to address the parties' debate over whether Sharma was prejudiced by these evidentiary rulings.

---

[8] Even considering this argument, the jury was made aware that Ashley J. was involved with men both before and after the incident, including at the time of trial, and of the testimony of others of the group that she kissed and danced with, and sat very close to, Sharma at the club. Sharma contends this evidence does less to establish Ashley J.'s willingness to engage in sex with him at the time, but we think it seriously diminishes the probative value of the ex-boyfriend evidence he sought to admit, particularly when it included Ashley J.'s clear indication to her friends that she did not like kissing Steven.

**B.** *Sharma's Constitutional Rights to a Speedy Trial Were Not Violated*

Sharma also argues the judgment must be reversed and the case dismissed because his right to a speedy trial under both the state and federal constitutions were violated by the delay in the commencement of his trial. We disagree.

### 1. The Relevant Proceedings Below

As we have discussed, Sharma waived his rights to a speedy preliminary hearing and arraignment, then in December 2019 generally waived his right to a speedy trial. He withdrew this waiver eighteen and a half months later, on July 14, 2021, during the COVID pandemic.

The trial court twice continued the trial, the second continuance extending the commencement of trial to September 13, 2021, the last day to conduct a speedy trial given Sharma's waiver withdrawal. On that date, the court found good cause to continue the trial to February 4, 2022 due to, as stated in the court minutes, the "exceptional and extraordinary circumstances, under Federal, State and Local emergency proclamations and in consideration of public health due to the Covid-19 pandemic." There is no other record of these proceedings.

On January 28, 2022, Sharma filed a written, one-page motion to dismiss his case under section 1382 for violation of his speedy trial right. He contended that on September 13, 2021 numerous courtrooms were not engaged in trial or were empty. He further relied on arguments, a declaration, and exhibits submitted in a motion to dismiss in another case, which he indicated were provided to the court and the People; however, they are not in the appellate record.

The People opposed Sharma's motion to dismiss on the grounds that the continuing impact of the COVID-19 pandemic provided good cause to

continue the trial under sections 1382, subdivision (a) and 1050, subdivision (b), and that the court had done what it could under pandemic-related circumstances to prioritize Sharma's Sixth Amendment right to a speedy trial.

On February 14, 2022, the trial court denied Sharma's motion. It stated that the courtrooms Sharma contended were available on his last day for trial "were not in use due to either cases having been settled or dismissed or due to staffing issues related to the global pandemic and not routine court congestion." Further, "post-June 18, 2021, cases" comprised "well over half the cases in the backlog. And since January 11, 2022, the Court has advanced all of the March 2020 to June 18, 2021, no-time-waiver, felony trials for assignment out to a trial courtroom."

At the conclusion of this hearing, the court confirmed Sharma's trial date as April 1, 2022. On that date, counsel for both parties declared themselves ready but Sharma's counsel was then in another trial. The court continued the trial to July 1, 2022.

The court's minute orders indicate a series of unexplained continuances followed. On July 1, counsel indicated they were ready, but defense counsel was unavailable. The court found good cause to continue the trial to July 28, 2022. On July 28, 2022, August 19, 2022, September 20, 2022, and September 30, 2022, the trial court also ordered trial continuances. The August 19 and September 30 minute orders state that the People were ready without reference to the defense. On October 17, 2022, counsel for both parties indicated they were ready; the court assigned the case to a trial department and continued the trial to October 24, 2022. The parties and the court proceeded towards trial, engaging in a lengthy hearing on motions in limine on November 3, 2022.

On November 7, 2022, however, the People moved under section 1050 for a further continuance of the trial to February 5, 2023. According to the People, the complaining witness, Ashley J., who lived out of state and was pregnant, was under subpoena, and had continuously indicated she would cooperate with the People and testify at trial. But the day before, she had texted the district attorney investigator coordinating her appearance and indicated she had been hospitalized due to complications with her pregnancy. With a due date of December 25, she was to remain in the hospital until her baby was born and possibly beyond that time.

The investigator submitted a declaration confirming these matters based on information and belief. She attached as an exhibit a photograph of a letter from a doctor treating Ashley J., which states Ashley J. was "unable to travel or attend court until after delivery and her appropriate period of postpartum recovery." The investigator also stated that she spoke to a doctor on Ashley J.'s medical team, who told her that "Ashley's condition is unpredictable and the earliest she might be available to travel is . . . February 5, 2023."

The court granted the People's motion on the date it was filed and continued the trial to February 6, 2023. At the same time, Sharma made an oral motion to dismiss the case under section 1382 and the court scheduled a hearing on that motion for the next month.

Sharma subsequently filed a written motion to dismiss under section 1382, section 15 of Article I of the state Constitution, and the federal Constitution, relying on *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker).* He also incorporated his January 28, 2022 motion. He argued the People had not established good cause for a trial continuance because they had supported their motion with hearsay rather than competent evidence; failed to establish

40

entitlement to a continuance under the factors articulated in *Owens v. Superior Court* (1980) 28 Cal.3d 238 (*Owens*) and the state Constitution; and failed to meet the *Barker* balancing test. Sharma also claimed he had suffered severe prejudice due to the stress of the unresolved case, delays in his immigration proceedings caused by the case, and the unavailability of a percipient witness, P.S., who would have testified to exonerating facts, i.e., that she saw Ashley J. and Sharma kissing and making out at the club on the night of the incident. He supported his motions with declarations by his lawyer and himself.

The People opposed Sharma's motion on the grounds that Ashley J.'s unavailability necessitated the continuance and the trial court's efforts to assign matters to trial departments showed it had prioritized Sharma's federal Constitutional speedy trial rights. They further contended that Sharma had failed to present competent evidence or legal authority for his claims of prejudice.

After considering the parties' papers and arguments at hearing, the trial court denied Sharma's motion to dismiss. It concluded the People had established their entitlement to a continuance under *Owens* by presenting sufficient competent evidence that Ashley J. was unavailable for trial, that she was the most important witness in the trial, that under the circumstances a 90-day continuance was no longer than necessary for her to recover from her pregnancy complications, and that the facts to which she would testify could not otherwise be proven. Commenting on the evidence presented, the court noted that there was "some urgency" involved in the circumstances, where "hundreds of jurors" were getting ready to be impaneled and questioned.

41

The court also rejected Sharma's federal constitutional and *Barker* claims. It noted he had been out of custody since the filing of the information; that for a majority of the previous three years, he had not made an effort to bring the case to trial; that he had waived his right to a speedy trial for some time; that after he withdrew his waiver the delays were caused by, first, the pandemic rather than the government's lack of diligence and, second, Ashley J.'s pregnancy complications. The court also found that the unavailability of P.S. did not establish prejudice because other witnesses who were available could testify to similar facts and that, while Sharma's immigration issues created stress and anxiety for him, it was not enough to merit dismissal.

Also, as to Sharma's arguments about unnecessary delays prior to November 2022, the court said, "I'm not going to reconsider prior decisions by . . . other judges within this courthouse about good cause continuance prior to the one we had in November. . . . It would be what I would consider an improper motion for reconsideration of a prior . . . ruling by this court. The court also said it would not "reconsider the merits of this Court's prior rulings on prior motions to dismiss . . . . Those were previously decided."

### 2. Legal Standards

Section 15 of Article I of the California Constitution provides, "The defendant in a criminal cause has the right to a speedy public trial . . . ." This right "protects the accused from facing an unduly lengthy period in which criminal charges are pending." (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1193 (*Hajjaj*).)

One of the principal statutes implementing this constitutional right is section 1382. (*Hajjaj, supra,* 50 Cal.4th at p. 1193.) It provides in relevant part that, upon the defendant's withdrawal of a general waiver, the defendant "shall be brought to trial within 60 days of the date of that withdrawal." (§ 1382, subd. (a)(2)(A).)

42

"The prosecution has the burden of establishing good cause to avoid dismissal" for violation of a speedy trial right.  (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1123 (*Hernandez-Valenzuela*); see *Mendoza v. Superior Court* (2024) 103 Cal.App.5th 865, 870.)  "[S]ection 1382 does not define good cause, 'but . . . in general, a number of factors are relevant to a determination of good cause: (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay. [Citations.]' " (*Hajjaj*, *supra*, 50 Cal.4th at p. 1197.)

"[A] broad variety of unforeseen events may establish good cause under section 1382." (*Hajjaj*, *supra*, 50 Cal.4th at p. 1198.)  "Good cause within the meaning of section 1382 exists, for example, when the delay beyond the statutory period is caused by the conduct of the defendant or occurs for his or her benefit, or there are unforeseen circumstances such as unexpected illness, unanticipated unavailability of counsel, or the absence of a witness despite due diligence to secure his or her attendance." (*Ibid*.)  Also, a panel of our colleagues in Division Three of this appellate district have held that "[t]he COVID-19 pandemic has been a ' "unique, nonrecurring event[]" ' which ' "ha[s] produced an inordinate number of cases for court disposition," ' " and a majority of the panel concluded this provided good cause for the delay reviewed in that case. (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at pp. 1127, 1136 (dis. opn. by Tucher, J.).)

On the other hand, " '[d]elay attributable to the fault of the prosecution . . . does not constitute good cause.  Neither does delay caused by improper court administration.' " (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at p. 1125, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 570.)  " '[W]hen the unavailability of a judge or courtroom is fairly attributable to the fault or

43

neglect of the state, such unavailability does not constitute good cause within the meaning of section 1382." (*Hernandez-Valenzuela*, at p. 1126, quoting *People v. Engram* (2010) 50 Cal.4th 1131, 1163 (*Engram*).) Nonetheless, " 'the lack of a sufficient number of judges or courtrooms might constitute good cause to justify the delay of trial under section 1382 in "exceptional circumstances," ' " although " 'delay arising out of chronic congestion of a court's trial docket cannot be excused.' " (*Hernandez-Valenzuela*, at p. 1126.) Thus, the "critical inquiry" for a court determining whether good cause exists for a trial delay due to court congestion or backlog "is whether the congestion or backlog is attributable to chronic conditions as opposed to exceptional circumstances considering all of the relevant circumstances." (*Hernandez-Valenzuela*, at p. 1127.)

"Although a defendant seeking pretrial relief for a speedy trial violation is not required to make an affirmative showing of prejudice [citation], the situation is different after judgment. [Citations.] 'Upon appellate review following conviction, . . . a defendant who seeks to predicate reversal of a conviction upon denial of his right to speedy trial must show that the delay caused prejudice . . . ." (*People v. Lomax* (2010) 49 Cal.4th 530, 557.) In evaluating prejudice, we " ' "weigh the effect of the delay in bringing defendant to trial or the fairness of the subsequent trial itself." ' " (*Ibid.*)

Also, "a defendant's failure to timely object to the delay and thereafter move for dismissal of the charges is normally deemed a waiver of his right to a speedy trial." (*People v. Wright* (1990) 52 Cal.3d 367, 389, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; accord, *People v. Anderson* (2001) 25 Cal.4th 543, 605.)

As for our standard of review under state law, " 'in making its good-cause determination, a trial court must consider all of the relevant

circumstances of the particular case, "applying principles of common sense to the totality of the circumstances. . . ." [Citations.] . . . [A]s a general matter, a trial court "has broad discretion to determine whether good cause exists to grant a continuance of the trial" [citation], and . . . , in reviewing a trial court's good-cause determination, an appellate court applies an "abuse of discretion" standard.' " (*Engram*, *supra*, 50 Cal.4th at p. 1163.)

The Sixth Amendment of the federal Constitution provides, "In all criminal prosecutions, the accused shall have the right to a speedy and public trial . . . ." The U.S. Supreme Court in *Barker* identified four factors courts should assess in determining whether a defendant has been deprived of this right: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker*, *supra*, 407 U.S. at p. 530.) "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (*Ibid*.) Generally, postaccusation delay is considered presumptively prejudicial at least when it approaches one year, and intensifies over time. (*Doggett v. United States* (1992) 505 U.S. 647, 652 & fn. 1, 657.)

The *Barker* court further explained regarding the second factor, the reason for a delay, "Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government, rather than with the defendant. Finally, a valid reason, such as a missing witness,

should serve to justify appropriate delay." (*Barker, supra*, 407 U.S. at p. 531, fn. omitted.)

### 3. Analysis

Sharma focuses much of his attention on his claim that, although his counsel was unavailable for trial due to another trial on July 1, 2022, counsel became available between July 6, 2022 and late July 2022 because that trial did not proceed as scheduled, and the courtroom for the trial was therefore available for Sharma's trial; and that the trial court was negligent in failing to use technology to keep track of these matters and proceed with his trial right away, rather than waiting until the first quarter of 2023 to proceed to trial. His arguments are unpersuasive.

We will not address the merits of this claim under state law because Sharma has waived it by not making any timely objection regarding court availability in July 2023 below. (See *People v. Wright, supra*, 52 Cal.3d at p. 389; accord, *People v. Anderson, supra*, 25 Cal.4th at p. 605.) Even if we did, we would reject it for much of the same reasons that we reject his federal constitutional claim, which we will soon discuss.

As for federal constitutional law, no timely objection is necessary, although the failure to make one is a factor in analyzing whether a violation of a defendant's right to a speedy trial has occurred. (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 390–391, citing *Barker, supra*, 407 U.S. at p. 532.) Nonetheless, under *Barker*, Sharma's arguments are unpersuasive. The length of the delay complained of is from December 2019, when Sharma was arraigned on the information, to the first quarter of 2023. This is a lengthy delay, but the reasons for it do not favor Sharma's claim. First, for almost two years, Sharma waived his speedy trial rights. Second, if we focus on the heart of Sharma's claim—that the court was negligent in delaying trial from July 2022 to the first quarter of 2023, the record makes clear this delay

46

was the result of the COVID-19 pandemic, Sharma's counsel's unavailability, Ashley J.'s unavailability, and continuances granted for reasons not contained in the record. Sharma does not show any of these findings and rulings were improper.

Most importantly, Sharma fails to show the court or the prosecution was negligent. He contends the trial court "did not explain why, in the high-tech center of San Francisco, it could not have implemented a system that would have allowed it to track defense attorneys who had multiple cases in which time was of the essence," or "use the low-tech solution of issuing an order requiring defense attorneys to place cases such as [Sharma's] on calendar when another case resolved." He contends the court's failure to do so prevented his case from being tried on July 2022 although his attorney and a courtroom were available, resulting in an extended delay that stretched into 2023.

This argument is unpersuasive. It is based on Sharma's speculation about what the superior court could have done to track this information. Sharma does not establish the trial court had a duty or the capacity to conduct the high-tech tracking he theorizes it could and should have done. As for his "low-tech" solution, the record indicates that after Sharma withdrew his waiver of his speedy trial right in July 2021 and the superior court began again scheduling trials in the wake of the COVID-19 pandemic, the court held frequent hearings in this case to determine whether it was ready for trial—in April 2022, two in July 2022, in August 2022, two in September 2022, and in October 2022. Sharma ignores these procedures and does not explain why they were not sufficient under *Barker* and the other authorities he cites. In our view, such hearings are arguably *more* effective

in tracking cases than the issuance of an order that attorneys place cases on the trial calendar when they become available.

Sharma also fails to show that he was prejudiced by the delays. He contended below in support of his November 2022 motion to dismiss that he was prejudiced by the unavailability of one of the members of the group at the club, P.S., to testify, and that she would have testified that she saw Sharma and Ashley J. kissing and making out. But the record indicates the defense, although it became aware in November 2019 that P.S. had moved to India, did not take any steps to preserve her testimony, such as through a conditional exam or seek to contact her or persuade her to return to testify.

More importantly, the testimony Sharma maintains P.S. would have given is similar to that of other witnesses that we have summarized, such as R.N.'s testimony that he saw Sharma and Ashley J. at the club kissing in what appeared to him to be a "make-out session," and R.M's testimony that he saw the two sitting closer together at the club than he would expect for people who were just being platonic. That testimony sharply reduces any prejudice Sharma might have suffered as a result of P.S.'s unavailability, whether or not, as Sharma implies, P.S. would have been a better witness because of R.N.'s high level of intoxication at the club or the vagueness of R.M.'s testimony. Regardless, any prejudice was slight, as the evidence of Ashley J.'s and Sharma's activities of the club was not particularly probative of the key element at issue: whether Ashley J. had the capacity to consent to sex with Sharma later in the evening at her apartment. The court was reasonable in concluding that P.S.'s testimony was not "so important, so critical, and so noncumulative that the loss of that witness establishes prejudice necessary to grant a motion to dismiss."

Finally, Sharma argues the emotional stress and anxiety caused by the delay of an unresolved criminal case, including because of its impact on unspecified immigration proceedings, further prejudiced him. But he offers no persuasive reason why this, combined with P.S.'s unavailability, is sufficient to establish the court erred in determining there was not sufficient prejudice from the complained-of delay, particularly given the historically extraordinary circumstances the superior court faced in light of the COVID-19 pandemic.

In short, Sharma's speedy trial claim is partially waived and lacks merit.

### III. DISPOSITION

The judgment is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
SIMONDS, J.*

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.